**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

EDWIN W. DENZLER,
Plaintiff-Appellee,

v.

QUESTECH, INCORPORATED;
WALTER V. EDWARDS, III; JOSEPH P.
O'CONNELL, JR.,
Defendants-Appellants.

No. 94-2109

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-93-1543-A)

Argued: October 30, 1995

Decided: March 19, 1996

Before MURNAGHAN, HAMILTON, and MOTZ, Circuit Judges.

_____

Affirmed in part and remanded in part by published opinion. Judge
Murnaghan wrote the opinion, in which Judge Hamilton and Judge
Motz joined.

_____

**COUNSEL**

**ARGUED:** Christina Miesowitz Burkholder, QUESTECH, INC.,
Falls Church, Virginia, for Appellants. Karl W. Pilger, BORING,
PARROTT & PILGER, P.C., Vienna, Virginia, for Appellee. **ON
BRIEF:** Norman H. Singer, KECK, MAHIN & CATE, Washington,

D.C., for Appellants. Brian V. Ebert, BORING, PARROTT & PIL-
GER, P.C., Vienna, Virginia, for Appellee.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

Edwin W. Denzler ("Denzler"), appellee-plaintiff, sued his former
employer Questech, Inc. ("Questech"), appellant-defendant, for pen-
sion benefits under the Employee Retirement Income Security Act of
1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. The district judge ruled in
favor of Denzler, granting his motion for summary judgment on
Questech's liability under the ERISA plan and, after holding hearings,
awarding him damages, costs, and attorney's fees. Questech has
appealed those orders. We affirm the lower court's summary judg-
ment order as to liability, but remand for recalculation of damages
and reconsideration of attorney's fees and costs.

I

A. The ERISA Plan

Denzler worked for Questech from November 9, 1978, until
August 31, 1990. He became a participant in an Officers and Manag-
ers Deferred Compensation Plan ("Def Com Plan" or "the Plan") in
1986 by executing a Joinder Agreement which specified the amount
of his retirement benefits--$350,000 payable at age 65 for ten years
at $35,000 per year.**1** In return for that benefit, Denzler agreed to have

_____
**1** Questech adopted the Def Com Plan in 1986 in order to attract quali-
fied employees and to provide a comfortable retirement for its highly
compensated managers and employees. The Def Com Plan was an
unfunded plan, commonly referred to as a "Top Hat" plan. Kemmerer v.
ICI Americas, Inc., 842 F. Supp. 138, 140-41 (E.D. Pa. 1994), aff'd in
relevant part, 70 F.3d 281 (3d Cir. 1995). Many ERISA rules and protec-
tions that apply to funded pension benefits plans, including detailed
accrual, vesting, funding, and fiduciary responsibility regulations, do not
apply to Top Hat plans. Barrowclogh v. Kidder, Peabody & Co., 752

Questech deduct $7,500 from his salary annually to contribute to the Def Com Plan. In 1990, however, Denzler took early retirement before reaching age 65. Under the terms of the Def Com Plan, he was entitled to receive an actuarial equivalent amount of $350,000 using the current interest rates for either discounting or compounding.

B. Questech's Payments Under the Plan

Upon retiring, Denzler requested a statement of his benefits. The Administrator of the Def Com Plan, an executive committee of the Questech Board of Directors, sent Denzler a letter dated October 2, 1990 ("the October letter") indicating that Denzler would be paid the sum of both a basic benefit and an added benefit. The basic benefit was $94,176 and the added benefit $255,830. The basic benefit, however, was reduced because of early retirement to $53,191--the actuarial equivalent amount of $94,176. The added amount of $255,830 remained the same.

Questech paid Denzler annual installments based on the sum of both the "added benefit" and "basic benefit" in 1990, 1991, and 1992. In 1993, however, the Plan Administrator reduced the benefit paid to Denzler as a result of the failure of the Def Com Plan holdings to generate the expected rates of return.[2] The Administrator argued that the reduced payments were justified because under the terms of the Def Com Plan, Denzler was entitled to a basic benefit only.

_____

F.2d 923, 935-37 (3d Cir. 1985), overruled on other grounds, Pritzker v. Merrill Lynch, 7 F.3d 1110 (3d Cir. 1993); Kemmerer, 842 F. Supp. at 141; Carr v. First Nationwide Bank, 816 F. Supp. 1476, 1486 (N.D. Cal. 1993). The enforcement provisions of ERISA described in 29 U.S.C. § 1132(a), however, apply to Top Hat plans. Barrowclogh, 752 F.2d at 935-37; Kemmerer, 842 F. Supp. at 141; Carr, 816 F. Supp. at 1486.
**2** The Def Com Plan was failing to produce an expected 10% rate of return, which was exacerbated by the fact that the number of participants in the Def Com Plan had dropped dramatically and the assumed mortality of participants had not occurred.

3

C. Denzler's Lawsuit

Denzler filed a series of complaints in federal district court arguing that he was entitled to his full early retirement benefit, not just a basic benefit. His first complaint alleged a breach of contract and sought a declaration of rights under the Plan. Denzler, with the district court's leave, amended his complaint because it failed to mention that his Def Com Plan was an employee benefit plan governed by ERISA. Subsequently, Denzler filed a second amended complaint seeking greater damages.

The district judge examined the Plan's documents--the Plan and the Joinder Agreement--and determined that they"[we]re clear on their face" and "clear as a bell" in that Questech owed Denzler his full benefit, taking into account his early retirement. Indeed, she stated that parol evidence was unnecessary because the documents were so clear and unambiguous. Nevertheless, she also examined the October letter. She noted that the letter supported her interpretation and that Questech could not just stop paying Denzler the payments the October 1990 letter promised after making those payments for three years. Finding that the Def Com Plan was clear and unambiguous and supported by the October letter, the district court granted Denzler's motion for summary judgment as to Questech's liability under the Def Com Plan.**3**

Subsequently, the district court held a hearing on damages and ruled that Questech owed Denzler a total retirement benefit of $318,000 based on a 10% discounted rate of the full $350,000 benefit that was to be paid out if Denzler retired at age 65. The court subtracted the $76,307.31 in benefits already paid to Denzler and entered a judgment order requiring that $241,692.69, plus interest for the overdue 1993 payments, be paid to Denzler. The court also entered several orders after a series of pleadings and hearings as to attorney's fees and costs. Ultimately, the court determined that Questech had acted in bad faith in refusing to pay Denzler his full early retirement

_____

**3** Denzler also sought an additional "termination benefit" under the Def Com Plan. The district court found that he was not entitled to that additional benefit.

benefit and awarded to Denzler costs of $4,212.64, and attorney's fees of $34,496.00. Questech appeals the district court's orders.

II

Questech appeals three categories of orders: (1) summary judgment on liability; (2) damages; and (3) attorney's fees and costs. We address each in turn.

A. Summary Judgment

We review a district court's summary judgment ruling under a de novo standard of review. Henson v. Liggett Group, Inc., 61 F.3d 270, 274 (4th Cir. 1995). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where there are no genuine issues of material fact. In making that determination, we review the record in the light most favorable to the nonmoving party.

Questech argues that it is not liable for the additional retirement benefits Denzler seeks because Denzler's compensation plan contained two types of benefit payments--a basic benefit, payable always, and an added benefit, payable only if the Plan generated a surplus (the "dual-payment theory"). Questech contends that once it became apparent that the Def Com Plan was not generating the expected rates of returns, the Plan Administrator had the right to reduce Denzler's payments to the basic benefit. Questech also argues that, in any event, the Plan was ambiguous as to what amount of benefits Denzler was due as an early retiree and that, therefore, summary judgment as to liability for more than the "basic benefit" was in error.

In interpreting ERISA plans, we turn to principles of the federal common law of contracts. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110 (1989); Wheeler v. Dynamic Engineering, Inc., 62 F.3d 634, 638 (4th Cir. 1995). We also turn to principles of state common law for guidance. Wheeler, 62 F.3d at 638.

Summary judgment on a contractual claim is appropriate only where there is no ambiguity in the contract or plan. World-Wide Rights, Ltd. Partnership v. Combe, Inc., 955 F.2d 242, 245 (4th Cir.

5

1992). The question of whether a contract is ambiguous is one of law, which we review de novo. Nehi Bottling Co. v. All-American Bottling Corp., 8 F.3d 157, 162 (4th Cir. 1993). Thus, we first examine the Plan to determine whether, as a matter of law, it is ambiguous on its face. Goodman v. Resolution Trust Corp., 7 F.3d 1123, 1126 (4th Cir. 1993).

The basic contractual documents defining the Def Com Plan and benefits are the Def Com Plan and the Joinder Agreement. A de novo review of those documents reveals that they unambiguously state that Denzler is to receive an actuarial equivalent of $350,000 upon early retirement. The Joinder Agreement provides that at age 65, Denzler is to receive a retirement benefit that shall equal $350,000. There is no mention, indication, or implication that $350,000 is the sum of two types of benefits or that a portion of the payment is optional, discretionary, or dependent upon the generation of a surplus. The Joinder Agreement also states that the $350,000 shall be paid in accordance with Article V of the Def Com Plan. Article V describes the procedure for paying an actuarial equivalent amount of $350,000 to early retirees.[4] Again, there is no indication that a portion of that actuarial equivalent amount is dependent upon a surplus or that the retirement benefit is divided into a basic benefit and an optional additional amount. The notion of dual payments is entirely absent from the Def Com Plan and the Joinder Agreement. Thus, Questech's attempt to justify its actions based upon a dual-payment theory is not supported by the relevant documents.

Nonetheless, Questech makes several arguments as to why the contract is ambiguous. We find those arguments unconvincing. Questech

_____

[4] Section 5.2(a) provides:

> All participants who attain age sixty-five (65) and complete four (4) years of participation in the Plan shall be entitled to a retirement benefit in the amount specified in the Participant's Joinder Agreement. A Participant may elect to retire anytime after he or she attains age fifty-five (55) and completes four (4) years of participation in the Plan. If the Participant retires at any age other than sixty-five (65), the Participant's retirement benefit shall be an actuarial equivalent amount, utilizing the then current Interest Rate for either discounting or compounding.

does not even attempt to point to any ambiguities relating to the distinction between a basic benefit and added amount in the Plan because there are none. Instead, Questech attempts to create an ambiguity in the Plan concerning the amount of early retirement benefits. Questech relies on two far-fetched readings of the Def Com Plan in its attempt to create that ambiguity.[5]

First, Questech contends that because the Plan states that early retirees are entitled to an actuarial equivalent amount without stating "amount of what," it is unclear what should be the base figure for the actuarial equivalent calculation. The Plan, read as a whole, however, clearly defines the base figure. The relevant provision in the Plan states that all participants' retirement benefits will consist of the amount specified in each participant's Joinder Agreement--in Denzler's case, $350,000. The Plan then provides that early retirees will receive an actuarial equivalent amount, utilizing the then current interest rate for either discounting or compounding. Read in its entirety, the Plan leaves no doubt that the actuarial equivalent amount is to be calculated using $350,000 as the base figure. No other figure is mentioned, nor is the possibility for another figure raised by the language of the relevant subsection.

Second, Questech attempts to create an ambiguity by relying on the subsequent subsection. That provision states that all retirement benefits shall be paid in accordance with the section describing what and how termination benefits are to be paid.[6] Questech attempts to argue that a reader could, therefore, possibly interpret the section describing

_____

[5] At oral argument, Questech attempted to create an additional ambiguity in the Plan by arguing that the interest rate used to calculate the benefit was subject to change. The interest rate, however, is not relevant to Questech's liability for full early retirement benefits. The interest rate is merely a number plugged into an unchanging formula. Thus, a change in the interest rate may be relevant to the actual amount of damages, but that change is not relevant to liability.

[6] Section 5.2(b) provides:

> The retirement benefit shall be paid in accordance with section 5.1(b) [describing termination benefits] as if it were part of the Participant's termination benefit.

7

how termination benefits are paid as also defining the actuarial equivalent amount.

There is no merit in Questech's argument. In stating that "[t]he retirement benefit shall be paid in accordance with" the section describing how termination benefits are paid, the Plan refers to all retirement benefits--both those paid at age 65 and the actuarial equivalent paid in the event of early retirement. Thus, under Questech's reading of the Plan, the termination benefit provision would define the amount of retirement benefits to be paid at age 65 and in the event of early retirement. The termination benefits provision, however, does not define the amount of benefits payable at age 65; that amount has been clearly defined as $350,000. Likewise, it makes no sense to read the termination benefit provision as defining the benefits to be paid in the event of early retirement.

Instead, a reasonable and consistent reading is that the provision Questech relies on means that retirement benefits are to be paid in the same manner that termination benefits are paid, for example, in roughly equal installments, not less than annually, and the like.[7] We therefore find the Plan clear and unambiguous as to Questech's liability to Denzler for an actuarial equivalent amount of $350,000.

_____

[7] The relevant provision, 5.1(b), states:

> Payment of the termination benefit shall be made in roughly equal installments, paid not less than annually, commencing on the first day of the month after which the termination occurs. The amount of each installment shall be determined on a level amortization rate, calculated by reference to the Participant's current Account balance plus interest projected at the then applicable Interest Rate. Such payment shall be made for a period equal to the number of years over which compensation was deferred by the Participant pursuant to his or her Joinder Agreement, but in no event shall exceed ten (10) years. Payment shall cease when all amounts credited to such Participant's Account have been distributed. If a Participant dies before all such payments have been made, any remaining monthly payments shall be made, as provided in this Article V, to such Participant's Beneficiary.

Questech has also raised several other issues relating to the district judge's determination of liability. The district judge did not end her discussion of the Plan with the fact that the documents were plain on their face. Despite a stated absence of a need to rely on parol evidence, the district judge turned to one of the prime examples of parol evidence offered by Questech--a letter dated October 1990. The district judge stated: "The Contract, the two contracts, the joinder agreement and the plan contract are clear on their face, and if there was any inconsistency, that October letter . . . makes it crystal clear." The district judge also turned to principles of estoppel, adding that the Administrator could not just stop making payments that it had made for three years when a person believed he had a contract for a set amount of benefits. In a subsequent proceeding on damages, the district judge emphasized that the October letter was critical to her finding as to liability. Questech argues that the district judge erred in her selective reliance on parol evidence and that the judge's reliance on principles of estoppel also constituted error.

We need not reach whether the district judge's reliance on the October 1990 letter and estoppel principles merits reversal. Based on our own de novo review, we find the Plan documents unambiguous and, therefore, do not turn to extrinsic evidence or principles of estoppel, but rather affirm the lower court's grant of summary judgment based on the unambiguous Plan. We note, however, that the alternative theories for imposing liability are questionable at best.[8]

_____

[8] Questech raises one additional ground for reversal--the district judge's reliance on a de novo standard of review for the Administrator's decision. The district judge indicated that she had accepted Denzler's argument that a de novo standard of review should be applied to the Administrator's decision to decrease Denzler's benefits because of an inherent conflict of interest between the Administrator and Denzler. See generally, Firestone Tire & Rubber, 489 U.S. at 110-115. Where the language in a plan is clear and unambiguous, the deference owed the Administrator's interpretation is not of great relevance because the meaning is apparent. Cf. Fagan v. National Stabilization Agreement of Sheet Metal Indus. Trust Fund, 60 F.3d 175, 179 (4th Cir. 1995) (stating that trustees' interpretation or construction of plan did not concern the court because "the . . . language of the plan[wa]s clear and unambiguous").

B. Damages

The Plan provides that Denzler shall receive "an actuarial equivalent amount [of $350,000] utilizing the then current Interest Rate for either discounting or compounding." Denzler's expert testified that Denzler was entitled to a total benefit of $318,181 under the terms of the Def Com Plan. The expert made his calculations by discounting a benefit of $350,000 with a 10% interest rate. The expert also testified, however, that his discounting method was not the same procedure used to make an "actuarial equivalent" determination.

The Plan states that the early retirement benefit is an actuarial equivalent amount calculated with a current discount or interest rate. The district court's reliance on discounting alone was contrary to the terms of the Plan and, therefore, clearly erroneous, absent evidence that the discounting method was what was intended in the Plan or was otherwise agreed to by the parties.[9]

Without evidence that the discounting method was intended or agreed to, the actuarial equivalent amount of $350,000 must be determined. No party has calculated the actuarial equivalent amount of $350,000. According to the parties, calculating an actuarial equivalent necessitates a computer or an actuary. Such calculations are for the parties and the district court in the first instance. We will therefore remand for recalculation of the appropriate damages.

C. Attorney's Fees

ERISA allows courts to award, at their discretion, reasonable attorney's fees. 29 U.S.C. § 1132(g). We review the district court's award

_____

[9] Denzler maintains that the parties intended that the discounting method be used to calculate early retirement benefits. We find the record unclear as to what was intended by the parties. Denzler further argues that the district court did not err because the discounted figure was the only figure before the court and both parties submitted evidence, including expert testimony, on Denzler's "discounted" retirement benefits. Denzler has forgotten that it is his burden to prove the appropriate level of damages as provided for under the Plan.

10

of attorney's fees and costs for abuse of discretion. <u>Custer v. Pan American Life Ins. Co.</u>, 12 F.3d 410, 422 (4th Cir. 1993).

In <u>Quesinberry v. Life Ins. Co. of North America</u>, 987 F.2d 1017, 1029 (4th Cir. 1993), we found that despite the remedial purposes of ERISA to protect employee rights and to secure effective access to federal courts, there was no presumption in favor of awarding attorney's fees to a prevailing insured or beneficiary. <u>Custer</u>, 12 F.3d at 422. Thus, we set forth five factors to provide general guidelines for district courts in making attorney's fees determinations under ERISA:

> (1) degree of opposing parties' culpability or bad faith;
>
> (2) ability of opposing parties to satisfy an award of attorney's fees;
>
> (3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances;
>
> (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and
>
> (5) the relative merits of the parties' positions.

<u>Quesinberry</u>, 987 F.2d at 1029. The <u>Quesinberry</u> "five factor approach is not a rigid test, but rather provides general guidelines for the district court." <u>Id.</u> Indeed, we have recognized that some of the factors may not be appropriate in any given case. <u>Id.</u> Nonetheless, we require the district court to justify an attorney's fee determination by evaluating the five factors in order to give us some basis for review. <u>Id.</u>

The district judge stated "I have already determined that . . . . attorney's fees are appropriate." The only prior grounds she, however, had given were that "under ERISA [attorney's fees] are definitely awardable." Indeed, the record indicates that she thought the only relevant

11

question was whether the fees requested "were reasonable." While she did note Questech's bad faith, she failed to conduct the type of analysis we require as a basis for review. See, e.g., International Brotherhood of Teamsters v. New York Teamsters Council Health & Hosp. Fund, 903 F.2d 919, 924 (2d Cir.) (remanding because of the failure to state reasons for denying attorney's fees under ERISA), cert. denied, 498 U.S. 898 (1990). Thus, while a remand is not always necessary if a court fails to evaluate all five factors, we remand here because of the failure to provide a basis for review.

Denzler also requests compensation for the attorney's fees he incurred on appeal. ERISA authorizes recovery of fees incurred on appeal. Banker v. American Mobil Power Corp., 64 F.3d 1397, 1404 (9th Cir. 1995); Brewer v. Protexall, Inc., 50 F.3d 453, 459 (7th Cir. 1995); Nachwalter v. Christie, 805 F.2d 956, 961 (11th Cir. 1986). We apply the same five Quesinberry factors in considering whether to award fees on appeal. American Mobile Power , 64 F.3d at 1404; Williams v. Caterpillar, Inc., 944 F.2d 658, 668 (9th Cir. 1991); Nachwalter, 805 F.2d at 962.

We award fees as to Questech's appeal of the district judge's summary judgment ruling on liability. We find that the bad faith factor weighs heavily in favor of awarding costs and fees. The terms of the Plan did not permit Questech to pay Denzler only a"basic benefit." As for the other four factors, the third and fifth factor also weigh in favor of awarding costs and fees. An award of attorney's fees is likely to deter other administrators from acting similarly under like circumstances and the relative merits of the parties' positions weighs in favor of awarding fees. As for the second and fourth factors, they are not particularly compelling either way. The parties did not argue on appeal that the second factor--ability to satisfy an award of attorney's fees--favored either side. The fourth factor--whether Denzler sought to benefit a class of plaintiffs or resolve a significant ERISA question --does not weigh in favor of awarding fees, but it does not weigh against awarding fees either. Thus, our evaluation of all five factors supports the award of fees.

We, however, do not award fees as to the appeal of the district judge's orders on damages and attorney's fees and costs. Questech's appeal of the damages calculation and award of fees and costs was not

12

in bad faith, nor do the relative merits of the parties' positions on those two issues merit attorney's fees. Questech secured a remand on both damages and attorney's fees and costs. As for the other three factors, two and four, as before, do not significantly weigh either for or against awarding fees. The remaining factor, likelihood to deter others, dictates against awarding fees on appeal because Questech had legitimate reasons to appeal the damages calculation and award of fees and costs.

Denzler should, therefore, submit a bill of costs to the Clerk of the Court within 30 days listing and justifying his costs and attorney's fees on appeal on the issue of Questech's liability. After Questech has responded, the Clerk shall assess attorney's fees and costs. If either party is dissatisfied, review by the Court is available.

For the foregoing reasons, we

<u>AFFIRM IN PART AND REMAND IN PART</u>.

13