John William RUDASILL, Jr.; and
Vickie Costner Rudasill,
Plaintiffs,

v.

WORLDWAY CORPORATION,
Defendant.

No. CIV. 4:97CV201–T.

United States District Court,
W.D. North Carolina,
Shelby Division.

April 15, 1999.

R.L. Gilbert, III, Bridges & Gilbert, P.A., Shelby, Michael L. Minsker, Charlotte, for John William Rudasill, Jr., Vickie Costner Rudasill, plaintiffs.

Maury B. Josephson, Brian S. Kaplan, Skadden, Arps, Slate, Meagher & Flom, New York, NY, Debbie W. Harden, Womble, Carlyle, Sandridge & Rice, Charlotte, for WorldWay Corporation, Lary R. Scott, Richard F. Cooper, William A. Marguard, John R. Meyers, John H. Morris, Donald L. Neal, R. David Slack, Robert A. Young, III, defendants.

## MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** came before the Court in August 1998 for a non-jury trial. For the reasons stated herein, the Court finds for the Defendant.

1. Unless otherwise noted, the findings of fact come from the testimony received at trial.

2. At trial, Plaintiffs' evidence concerning Mr. Rudasill's rise through the corporations was

## I. PROCEDURAL HISTORY

This action was originally filed in state court and removed to federal court by the Defendants. In November 1997 the undersigned dismissed four of the Plaintiffs' eight causes of action based on preemption of state common law claims by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, et. seq. The Plaintiffs' claims for compensatory and punitive damages were also stricken because ERISA does not authorize such claims. In July 1998, the Defendants were granted partial summary judgment as to Plaintiffs' claim for breach of fiduciary duty under ERISA and claims against the individual officers. Defendant's other grounds for summary judgment were denied. Thus, at trial the remaining claims were the fifth cause of action for a declaration of entitlement to accelerated severance benefits under a Senior Executive Benefit Plan, the sixth cause of action for a declaration of rights under that Plan and the eighth cause of action for attorneys' fees.

## II. FINDINGS OF FACT [1]

In 1975, John Rudasill (Rudasill) began working for Carolina Freight Carriers Corporation (Carriers), a subsidiary of Carolina Freight Corporation (Carolina Freight). By 1988, he had risen to the rank of vice president of management information systems. **Plaintiffs' Trial Brief at 1, Defendant WorldWay's Proposed Findings of Fact and Conclusions of Law (incorporated in Defendant's Trial Brief) at 1, 3.** In 1989, he was named president of Carrier Computer Service (CCS), another subsidiary of Carolina Freight (which was later renamed WorldWay Corporation (WorldWay)). CCS was formed to provide computer, database and management services to Carriers. **Id.**[2] Rudasill held this position until his termi-

almost nonexistent forcing the Court to rely on the Defendant's undisputed proposed findings of fact.

nation in October 1995 after WorldWay was acquired by Arkansas Best Corporation (Arkansas Best).

Carriers, the corporation for which Rudasill first worked, was an over-the-road less than full truckload motor freight carrier formed in the 1930's. **Defendant's Proposed Findings of Fact at 2.** Defendant contends, and the Plaintiffs do not dispute, that Carriers formed Carolina Freight, later known as WorldWay, in 1982 to serve as its corporate parent. *Id.* Arkansas Best is a holding company but its subsidiaries are involved in various aspects of the transportation industry, including trucking, freight, brokering of hauling services and tire businesses both nationally and internationally.

On July 1, 1988, Rudasill and Carriers entered into a Senior Executive Benefit Plan Agreement (Plan) which was designed "to provide Employee and his beneficiary with the benefits of salary continuation, supplemental retirement, and a post retirement death payment." Plaintiffs' Exhibit 1. That portion of the Plan dealing with benefits after termination of employment provided in pertinent part:

9. *Termination of Employment.*

(a) If the employment relationship between Company and Employee terminates for any reason other than the retirement, death or disability of the Employee, benefits are payable to Employee or to his designee only to the extent that the Employee has vested benefits as set forth in paragraph 5 as provided herein.[3]

(b) ... [I]n the event such employment relationship is terminated by the Company or any successor corporation at any time after a *change in control* of

the Company or any successor corporation, and *such termination occurs without the written approval of a majority of the Incumbent Board as defined in paragraph 9(c)(2) either before or after such termination occurs,* the Company or its successor corporation, as the case may be, shall pay to Employee the benefits provided in paragraph 4 [4] herein commencing on the first day of the month immediately following the date of such termination of employment. Payment of such benefits shall relieve Company of all other obligations for payment under this Agreement.[5]

(c) ... [A] "change in control" of the Company ... shall be deemed to have occurred at such time as ... (2) individuals who constitute the Board on the date hereof (the "Incumbent Board") cease for any reason to constitute at least a majority thereof, *provided that any person becoming a director subsequent to the date hereof whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least three quarters of the directors comprising the Incumbent Board ... shall be ... considered as ... a member of the Incumbent Board.*

*Id.* **(emphasis added) (footnotes added).** The Plan also prohibited the employee during the time when monthly payments would be forthcoming from competing, directly or indirectly, with the company. *Id.* Failure to abide by that provision would trigger forfeiture of all rights under the Plan. *Id.* The Plan was binding on successors in interest to Carriers and the parties do not dispute that it applied at the time of Rudasill's termination from CCS. *Id.*

At issue, then, is whether Rudasill was terminated in writing by the Incumbent

---

**3.** Paragraph 5 of the Plan provided for a supplemental retirement benefit of $102,960 to an employee who had vested, *i.e.,* who had completed fifteen years of service with the company. **Plaintiffs' Exhibit 1.**

**4.** Paragraph 4 of the Plan provided for a salary continuation benefit if the employee

died while in service but before his 65th birthday. **Plaintiffs' Exhibit 1.**

**5.** This provision is called the "accelerated severance" benefit by the parties and provided the same salary continuation benefit as if the employee had died prior to retirement. **Plaintiffs' Exhibit 1.**

Board and whether he thereafter engaged in competition with his previous employer. In this regard, the parties agree on the composition of the Board of Directors as of July 1, 1988. However, they do not agree that the board which terminated Rudasill was the Incumbent Board. An understanding of some of the facts leading up to WorldWay's acquisition by Arkansas Best is necessary to resolve the first issue.

John Yorke, who was in-house counsel to Carolina Freight, testified that in 1988 changes were made to the Plan in response to fears of a hostile take-over of the corporation.[6] As a result, the corporation hired several law firms to assist in modifications of the existing senior executive benefit plan and embarked on "Project Early" which was designed to repel such take-overs. In fact, he testified that portions of the Plan, as modified, were designed to be "shark repellent," a measure to force a take-over group to deal with the existing board of directors. Rudasill's Plan was the result of that project.

By 1993 Carriers was sustaining serious losses and Lary Scott was hired as the chief executive officer to turn the company around or arrange a merger or negotiated purchase. **Defendant's Exhibit 12, Affidavit of Lary Scott, at 4.** In May 1995 Carolina Freight, the parent company, changed its name to WorldWay Corporation. **Defendant's Exhibit 65.** By July 1995, WorldWay was in such serious financial trouble that its banks had refused to extend any more credit and bankruptcy was looming. According to Yorke, if WorldWay had not merged with Arkansas Best, it would have gone out of business.

Rick Cooper is the vice president and general counsel of Arkansas Best and was part of the team involved in the acquisition of WorldWay. Arkansas Best formed ABC Acquisition Corporation (ABC) solely for the purpose of making a tender offer to WorldWay. On July 8, 1995, the WorldWay board of directors[7] unanimously adopted a resolution approving the merger agreement which provided for the purchase of the common stock of WorldWay at $11.00 per share. **Defendant's Exhibits 1 & 2.** Included in the merger were provisions calling for the resignation of certain numbers of WorldWay's board of directors depending on the percentage of stock ultimately purchased by Arkansas Best. *Id.* Under the terms of the agreement, Arkansas Best would then appoint directors to fill the vacancies from its board. *Id.* In fact, the identities of the individuals from whom the directors would be chosen were disclosed. **Defendant's Exhibit 4.** By approving the merger, WorldWay's board of necessity approved both their own resignation and the subsequent appointment of replacement directors. After the close of the agreement, ABC would merge into WorldWay which would be the surviving corporation. **Defendant's Exhibit 1 & 2.** On July 14, 1995, WorldWay's shareholders were notified of the agreement, including those provisions requiring the resignation of a number of the board of directors proportionate with Arkansas Best's acquisition of corporate shares. **Defendant's Exhibit 4.** And, the shareholders, like the directors who approved the merger, were provided with the names and biographical information of the individuals from whom these vacancies would be filled. *Id.,* **at Annex I at page I–2; Defendant's Exhibit 5 at Schedule I, 38–40.** At midnight on August 10, 1995, the offer closed and Arkansas Best acquired 91 percent of WorldWay's stock. Pursuant to Section 1.5 of the merger agreement, on August 11, 1995, seven members of the board of directors of WorldWay resigned and Arkansas Best

---

**6.** Mr. Yorke described a hostile take-over as occurring when another business begins buying large volumes of the corporate stock or negotiates directly with shareholders rather than with the board of directors.

**7.** The board of directors was Lary Scott, James Martin, Charles Grace, Paul Richardson, K.G. Younger, J.M. Carstarphen, William Mapel and Daniel Boggan.

appointed replacements for those vacancies. **Defendant's Exhibits 3 & 6.** On August 11, 1995, board members were Lary Scott, Robert Young, Donald Neal, Richard Cooper, John Meyers, David Slack, William Marquard and John Morris. *Id.* Until the Interstate Commerce Commission approved of the merger, the stock was held in trust. Once the merger had closed, the corporations began the process of integrating their subsidiaries. Thus, on September 20, 1995, Carriers merged into ABF Freight System, Inc. (ABF) which is also a subsidiary of Arkansas Best. **Plaintiffs' Exhibit 15.** On October 12, 1995, WorldWay and ABC merged. **Plaintiffs' Exhibit 16.**

Before making the tender offer, Cooper, on behalf of Arkansas Best, reviewed WorldWay's Senior Executive Benefit Plan and noted that pursuant to paragraph 9 thereof the merger would affect a change in control. He was thus careful to comply with the Incumbent Board provisions of that paragraph because, although he did not know whom would be terminated, he was sure that terminations would follow the merger.

Paul Richardson was a member of WorldWay's board of directors when the merger was approved. All of the directors thought the offer was excellent and felt that whatever was necessary to complete the merger should be done. The directors unanimously approved the merger, including those portions requiring their resignation. In fact, the directors tendered their resignations on July 8, 1995, during the meeting at which the merger was approved on the condition that they be held in escrow. The directors also saw the list of their potential replacements prior to approving the merger.

The corporate by-laws for WorldWay contained the following provision concerning vacancies in the board of directors: Any vacancy occurring in the Board of Directors ... may be filled by the Board of Directors. *If the directors remaining in office do not constitute a quorum, the directors may fill the vacancy by the affirmative vote of a majority of all the directors, or by the sole remaining director, remaining in office.... A director elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office.* **Defendant's Exhibit 18, at Article III, Section 5 (emphasis added).** Lary Scott, as the sole remaining director, appointed the directors designated by Arkansas Best to fill the vacancies created by the resignations of WorldWay's seven directors.

On October 17, 1995, WorldWay's board of directors unanimously approved in writing the termination of Rudasill, who at that time was an employee of CCS.

Palmer Huffstedder, a senior vice president of Carriers, testified that he drafted portions of the Plan which were designed to calm corporate officers in the event of an unwanted take-over of the corporation and thus, to prevent officer flight. In his opinion, the board as composed on July 1, 1988, constitutes the Incumbent Board for Rudasill's case and that board evolved according to the Plan's specifications through July 1, 1995. He also opined that appointments to fill vacancies created by resignations from the board were not valid until approved by a majority of the shareholders' vote at the annual meeting. Thus, the board of directors created after the resignations and prior to the merger was not the Incumbent Board because no shareholder vote had occurred.

The corporate by-laws provide that "[e]xcept as provided in the corporation's articles of incorporation or in Section 5 of this Article III, the directors shall be elected at the annual meeting of shareholders ...." *Id.,* at **Article III, Section 3.** As noted above, Section 5 of Article III provides in pertinent part, "[a]ny vacancy occurring in the Board of Directors ... may be filled by the Board of Directors. *If the directors remaining in office do not constitute a quorum, the directors may fill the vacancy by the affirmative vote of a*

*majority of all the directors, or by the sole remaining director, remaining in office."* **Id., at Article III, Section 5 (emphasis added).**

At trial, Rudasill testified that since late 1995, he has been the president of Phoenix Computer Services, a company which offers computer services to companies in the transportation industry and which is owned by Crouse Cartage Company (Crouse). Crouse is also a less than full truckload carrier but Rudasill stated it operates in a different geographic area. The services he now provides are very similar to those in his previous job with CCS. He does not consider himself to be in competition with Arkansas Best because as president of CCS, he provided services only to Arkansas Best subsidiaries.

David Hart is the president of Datatronics, an Arkansas Best subsidiary, which provides software and systems maintenance for other Arkansas Best subsidiaries. In his opinion, Phoenix Computer Services directly competes with Arkansas Best because the provision of computer services to any trucking business is competition.

### III. CONCLUSIONS OF LAW

■ "The award of benefits under any ERISA plan is governed in the first instance by the language of the plan itself." "[A]n employer selling a plant and terminating the employment of its employees there has no ongoing obligation to pay severance benefits unless such an obligation is provided for under the terms of the then-existing plan."

*Hickey v. Digital Equipment Corp.,* 43 F.3d 941, 947 (4th Cir.1995) (citations omitted). When interpreting ERISA plans, courts look to the federal common law of contracts. *Denzler v. Questech, Inc.,* 80 F.3d 97, 101 (4th Cir.1996). Whether a contract is ambiguous is a question of law determined from the face of the plan. *Id.* If the plan is not ambiguous, it is unneces-

sary to look to extrinsic evidence. *Id.,* at 103.

Here, the parties agree that Rudasill was vested in his plan and that a change in the control of the employer occurred. The only issue is whether he was terminated by the incumbent board as defined under the terms of the plan. The Court finds the plan unambiguous; it clearly states what action would trigger an accelerated severance benefit package to a vested employee. That being the case, it is unnecessary to resort to extrinsic evidence. "Thus, [WorldWay] had no obligation to pay severance benefits to [Plaintiffs] unless the Plan included such an obligation. The crux of this case involves the meaning of one phrase in the Plan ...." *Hickey,* 43 F.3d at 947. That phrase is "Incumbent Board."

■ Rudasill's accelerated severance benefits would be triggered only by his termination by a board of directors other than the incumbent board after a change in control of the employer. The Plan contained a method by which the incumbent board had a natural evolution: "any person becoming a director subsequent to the date [of this Plan] whose election, ... was approved by a vote of at least three quarters of the directors comprising the Incumbent Board ... shall be ... considered as ... a member of the Incumbent Board." The parties agree that the board of directors on July 8, 1995, was the incumbent board. On that date, the directors approved the merger, including the provisions contained in the merger agreement requiring their resignation and the appointment of new directors at the discretion of Arkansas Best. On that same date, seven of the directors submitted their written resignations to be held in escrow pending the closing of the merger between WorldWay and Arkansas Best. And on that date, those same directors gave Lary Scott the authority to take whatever measures were necessary to implement the merger. By approving the merger, the directors approved the selection of di-

rectors by Arkansas Best by a majority vote. When Scott later appointed the directors, they became the Incumbent Board because their election was approved by a majority of the directors comprising the Incumbent Board. *See, e.g., Matter of Forum Group, Inc.*, 82 F.3d 159, 163 (7th Cir.1996); *O'Connell v. Continental Can Co., Inc.*, 2 F.3d 1153 (table), 1993 WL 300810 at *3 (7th Cir.1993) ("[T]he employees ignore the undisputed fact that Continental's board of directors approved the language of the Asset Purchase Agreement—including the amending language ... two days before the ... closing."). And, Scott clearly had the authority to make these appointments. "Any vacancy occurring in the Board of Directors ... may be filled by the Board of Directors. If the directors remaining in office do not constitute a quorum, the directors may fill the vacancy by the affirmative vote of a majority of all the directors, or by the sole remaining director, remaining in office."

Plaintiffs' argument that an election of directors had never previously occurred in this manner is of no moment. How elections occurred in the past is extrinsic evidence; the language of the Plan is clear and it clearly allowed the evolution which occurred.

The Court therefore finds the Plaintiffs are not entitled to accelerated severance benefits. The Defendant argues, however, that Rudasill's employment with Phoenix constitutes competition which precludes him from receiving his supplemental retirement benefits under paragraph 5 of the Plan. On this point, the only evidence presented at trial was when Rudasill was terminated in 1995, he had been employed by the company for 20 years. Thus, he satisfied the "vested" requirement for supplemental retirement benefits. Under paragraph 4 of the Plan, he was entitled to the monthly payment over a 15–year period of $102,960. Under paragraph 10 of the Plan, he would forfeit this benefit if "during his employment with Company, and for the further period during which monthly installments are payable hereunder, Employee ... without the prior consent of the Board of Directors of the Company, directly or indirectly render[s] any services to, [or] become[s] employed or otherwise participate[s] or engage[s] in the financing or conduct[ing] of any business which competes with any business conducted by Company *in an area where such business is being conducted by Company.*" **Plaintiffs' Exhibit 1 (emphasis added).**

▪ Rudasill testified that since late 1995 he has been employed by Phoenix Computer Services which provides computer services to Crouse Cartage. Phoenix and Crouse are owned by the same parent company. Crouse's headquarters are in Iowa and provides less than full truckload services in 15 states in the north central and midwest portions of the United States. **Defendant's Exhibit 83.** World-Way, at the time of its acquisition by Arkansas Best, provided less than full truckload services in eastern states and western states through Carolina Freight Carriers and GI Trucking. **Defendant's Exhibit 81.** Red Arrow, another subsidiary, may or may not have provided less than full truckload services but, in any event, concentrates in southwestern states. *Id.* The Court therefore cannot find that Rudasill has directly or indirectly competed with his former employer. Rudasill is entitled to his supplement retirement benefits provided he does not engage in such competition in the future.

▪ The last issue is the Plaintiffs' claim for attorneys' fees. "ERISA provides that a 'court in its discretion may allow a reasonable attorney's fee and costs of action to either party.'" *Metropolitan Life Ins. Co. v. Pettit*, 164 F.3d 857, 865 (4th Cir.1998) (citing 29 U.S.C.A. § 1132(g)(1)). In determining whether an award is justified, a court should consider (1) the degree of the defendants' culpability or bad faith; (2) the ability of the defendants to satisfy an award; (3) whether an award would deter other entities acting under similar circumstances; (4)

whether the plaintiffs sought to benefit all participants in the ERISA plan or sought to resolve a significant legal issue concerning ERISA; and (5) the relative merits of the parties' positions. *Id.*, at 865–66 (citing *Denzler*, 80 F.3d at 104). The Defendant's position in this lawsuit was clearly not taken in bad faith, as seen from the undersigned's conclusion in its favor. And, although the Defendant has the ability to satisfy any award, it would serve no deterrent purpose. WorldWay's position was supported by legal interpretation and the facts of the merger. Rudasill's actions were taken on his behalf alone and did not involve a significant legal interpretation of the ERISA statutory scheme. The relative merits of the parties' respective positions do not warrant an award of attorneys' fees.

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiffs are not entitled to accelerated severance benefits;

**IT IS FURTHER ORDERED** that the Plaintiffs are entitled to supplemental retirement benefits, provided that Plaintiff John Rudasill does not engage in activity in violation of paragraph 10 of the Plan; and

**IT IS FURTHER ORDERED** that the Plaintiffs are not entitled to attorneys' fees.

A Judgment encompassing these rulings is filed herewith.