UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 03-2282

T. SAM SCIPIO, JR.,

Plaintiff - Appellant,

versus

UNITED BANKSHARES, INCORPORATED, a/k/a United
National Bank,

Defendant - Appellee.

Appeal from the United States District Court for the Northern District of West Virginia, at Clarksburg. Irene M. Keeley, Chief District Judge. (CA-01-175-1)

Argued: October 26, 2004               Decided: December 22, 2004

Before WILKINSON and TRAXLER, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Donald Martin Kresen, GOLD, KHOUREY & TURAK, L.C., Moundsville, West Virginia, for Appellant. Charles T. Berry, BOWLES, RICE, MCDAVID, GRAFF & LOVE, P.L.L.C., Morgantown, West Virginia, for Appellee. **ON BRIEF:** William J. Yaeger, Jr., HERNDON, MORTON, HERNDON & YAEGER, Wheeling, West Virginia, for Appellant. Paul E. Frampton, BOWLES, RICE, MCDAVID, GRAFF & LOVE, P.L.L.C., Charleston, West Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

T. Sam Scipio, Jr. brought this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.A. § 1132(a)(1)(B) (West 1999), alleging that the Plan Administrator for United Bankshares, Inc., a/k/a/ United National Bank, improperly calculated benefits due him under a non-qualified executive retirement plan. On cross-motions for summary judgment, the district court denied Scipio's motion for summary judgment and granted United's motion for summary judgment. We affirm.

I.

Prior to 1988, Scipio was employed by First Empire Federal Savings and Loan Association ("First Empire"). In 1988, First Empire became the wholly-owned subsidiary of Eagle Bancorp, Inc. ("Eagle"), through a mutual stock conversion. Shortly thereafter, First Empire and Eagle executed employment agreements with a handful of key employees, including Scipio, and established a Non-Qualified Retirement Plan for Executives (the "Retirement Plan" or "Plan") and a Non-Qualified Stock Option and a Stock Appreciation Rights Plan (the "Stock Option Agreement").

Under the Stock Option Agreement, Scipio was granted a non-qualified stock option for 10,000 shares of Eagle stock, which was increased to 20,000 shares by virtue of a later stock-split. Scipio elected to exercise his stock option in October 1993.

3

Pursuant to the requirements of the Internal Revenue Code, First Empire reported on Scipio's W-2 Form the difference between the exercise price and the fair market value of the stock at the time the option was exercised. The amount of the difference was $408,000. That amount, plus his normal salary, resulted in a final W-2 report of adjusted gross pay of $496,933.65 for the year 1993.

In 1996, United Bankshares, Inc., acquired Eagle and First Empire, and merged the three companies into United National Bank ("United"). Scipio became an employee of United, and United became the successor in interest for the payment of benefits under the Employment Agreement and Retirement Plan. In November 1996, Scipio resigned from United and sought severance pay under the Employment Agreement. Scipio also notified United of his intent to draw benefits under the Retirement Plan beginning at age 55.

Under the Retirement Plan, executives may elect to receive "Normal Retirement Benefits" beginning at age 65, or "Early Retirement Benefits" beginning at age 55. J.A. 33. Generally speaking, annual retirement benefits under the Retirement Plan are calculated at 70% of the employee's "Final Average Earnings," reduced by the amount of certain other benefits not relevant to this appeal. J.A. 33. Those who elect "Early Retirement Benefits" will receive "an annual pension commencing at such Early Retirement Date computed in accordance with [the formula for calculating

4

Normal Retirement Benefits] but based on his or her Final Average Earnings . . . at such Early Retirement Date."  J.A. 33.

Under the terms of the Plan, "Final Average Earnings" are calculated by averaging

> the highest five consecutive calendar years of annual Earnings received by an Executive from the Employers during the calendar year of retirement and the nine calendar years prior to the Executive's Early Retirement Date [or] Normal Retirement Date. . . , whichever is applicable.  Earnings in the year of retirement are annualized and treated as calendar year earnings for this purpose.

J.A. 32.  "Earnings" are defined in the Plan as "the total earnings received from the Employers during a calendar year, excluding any specific bonuses which the Board of Directors stipulates as excluded for purposes of th[e] Plan."  J.A. 32.

Scipio elected in 1996 to receive Early Retirement Benefits under the Plan, but would not reach age 55 until 1999. Accordingly, his benefits were to be calculated based upon "the highest five consecutive calendar years of annual Earnings received" out of years 1990 through 1999.  J.A. 32.

Contemporaneously with his resignation and election of early retirement benefits, Scipio informed United's Plan Administrator that he considered his annual earnings for the ten consecutive years preceding his Early Retirement Date to be as follows: $67,744.00 in 1990; $79,043.95 in 1991; $79,043.95 in 1992; $496,933.65 in 1993; $101,008.13 in 1994; $101,419.13 in 1995; and

5

annualized earnings based upon his 1996 income (later computed by the Plan Administrator to be $106,209.36) for years 1996 through 1999.

Upon receipt of Scipio's notification that he intended to draw early retirement benefits, the Plan Administrator contacted its benefits consultant, Aon Consulting, and requested a calculation of the benefits payable. According to Aon Consulting's calculations, Scipio's Final Average Earnings would be based upon the five years immediately preceding his early retirement date ($101,419.13 for year 1995 and $106,209.36 annualized earnings for each of the years 1996 through 1999), resulting in a Final Average Earnings of $105,251.31, and a gross annual retirement benefit of $73,675.92.

Scipio protested this calculation and, more particularly, Aon Consulting's failure to consider the $408,000 gain from the exercise of his stock option in 1993 as earnings for that year. If that amount were included as Scipio believed it should be, the highest five consecutive calendar years of annual earnings received by him would include the year 1993 (specifically years 1993 through 1997), which would result in a "Final Average Earnings" of $182,355.92 per year, and a gross annual retirement benefit of $127,649.14.

The parties agree that the crux of this dispute centers on whether the $408,000 from Scipio's election of his stock option under the Stock Option Agreement in 1993 must be included as part

6

of Scipio's "Earnings" for purposes of computing his "Final Annual Earnings" and his annual benefit due under the Retirement Plan. J.A. 32. Their inability to resolve the dispute over the proper method of calculation led to the filing of this action. The parties agreed that there were no genuine issues of material fact and filed cross-motions for summary judgment. The district court granted summary judgment to United and denied Scipio's cross-motion for summary judgment. This appeal followed.

## II.

We review the district court's rulings on summary judgment de novo, applying the same standards that governed the district court's review. See Gallagher v. Reliance Standard Life Ins. Co., 305 F.3d 264, 268 (4th Cir. 2002).

We review the plan administrator's decision under the well-established principles articulated by the Supreme Court in Firestone Tire and Rubber Company v. Bruch, 489 U.S. 101 (1989). Benefits determinations based on plan interpretations are reviewed de novo, unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. If the benefit plan vests the plan administrator with such discretionary authority, our review of the plan administrator's decision is solely for an abuse of that discretion. See id. at 111. We review de novo whether the language of the benefit plan grants the plan administrator

7

discretion and whether the administrator acted within the scope of that discretion.  See Feder v. Paul Revere Life Ins. Co., 228 F.3d 518, 522 (4th Cir. 2000).

Scipio's first claim on appeal is that the district court erred in finding that United's Plan Administrator had discretion to interpret the term "Earnings" under the Plan.

Under the terms of Section 6.1 of the Retirement Plan, "[t]he Board of Directors of First Empire serves as the Plan Administrator."  As Plan Administrator, the Board is granted, inter alia, the power "[t]o determine benefit rights," as well as the more explicit power

> [t]o determine, in accordance with uniform standards, any question arising in the administration, interpretation and application of the plan, such determination to be conclusive and binding to the extent the same shall not be plainly inconsistent with the terms of the Plan or any applicable law.

J.A. 36.

Scipio does not quarrel with the Plan's general grant of discretion to interpret the Plan pursuant to this provision. Rather, he asserts that it does not grant to the Plan Administrator the discretion to interpret unambiguous terms in the Plan document, and that the term "Earnings" is clear and unambiguous, plainly meant to include amounts received under the Stock Option Agreement. Accordingly, Scipio asserts, the appropriate standard of review is de novo, and the court's only inquiry should be one to determine whether the plain meaning of the term was administered properly by

8

the Plan Administrator as a matter of law. Cf. Denzler v. Questech, Inc., 80 F.3d 97, 103 n.8 (4th Cir. 1996) (noting that "[w]here the language in a plan is clear and unambiguous, the deference owed the Administrator's interpretation is not of great relevance because the meaning is apparent").

As noted above, "Final Average Earnings," for purposes of calculating the retirement benefit, is defined as "the average of the highest five consecutive calendar years of annual Earnings." J.A. 32. "Earnings" is defined as "the total earnings received from [United] during a calendar year." J.A. 32 (emphasis added). The district court held that, although the Plan purports to define the term "Earnings," it does so in a "circular" fashion. J.A. 166. In short, the definition of the term "Earnings" includes the word "earnings," rendering it of little benefit to resolving the question of whether the term was meant to include gains realized from the exercise of stock options under the Stock Option Agreement. Accordingly, the district court concluded, the term is ambiguous and, therefore, subject to discretionary interpretation by the Plan Administrator.

Scipio asserts that this was error on the part of the district court. More particularly, he asserts that the term "Earnings" is defined as "total earnings," that "total earnings" is a term broader than wages or compensation, and that the term "should plainly be read to include all earnings [Scipio] received from his

9

employer through the exercise of his stock options." Brief of Appellant at 12.

We fail to find the proffered clarity in the definition that Scipio advances; indeed, his interpretation of the phrase "total earnings" still relies upon the word "earnings." We agree with the district court's determination that the Plan's definition of "Earnings" is ambiguous and, therefore, that the Plan Administrator has discretion to determine whether it includes benefits derived from the exercise of stock options under the Stock Option Agreement.

III.

Under the abuse of discretion standard, a plan administrator's decision "will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently." Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 232 (4th Cir. 1997). A "plan administrator's decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Bernstein v. CapitalCare, Inc., 70 F.3d 783, 788 (4th Cir. 1995) (internal quotation marks omitted).

A number of factors have been outlined as relevant to the court's evaluation of whether a Plan Administrator has abused its discretion. We may consider, but are not limited to, such factors as:

10

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Booth v. Wal-Mart Stores, Inc. Assoc. Health & Welfare Plan, 201 F.3d 335, 342-43 (4th Cir. 2000) (footnote omitted).

A.

We first address Scipio's argument that, notwithstanding any ambiguity in the Plan that would normally find itself subject to discretionary interpretation, we should review this Plan Administrator's interpretation of the definition of earnings de novo because the Retirement Plan at issue is an unfunded, non-qualified executive retirement plan. Because it is unfunded and non-qualified, funds are not set aside to pay the benefits and all retirement benefits must be paid directly by United to Scipio. Such plans, Scipio argues, create a clear and unique conflict of interest undeserving of the deference we would normally grant to a plan administrator in such cases.

Scipio correctly points out that the Plan Administrator suffers from a conflict of interest. However, this court also has "a well-developed framework for considering such conflicts of

11

interest in [the] court's reviewing calculus." Ellis, 126 F.3d at 233. "[W]here a plan administrator or fiduciary is vested with discretionary authority and is operating under a conflict of interest, that conflict must be weighed as a factor[] in determining whether there is an abuse of discretion." Id. (internal quotation marks omitted). It remains, however, "just one of several [factors] that [the] court should consider in determining whether an administrator or fiduciary has abused the discretion vested in it." Id. "[T]he court applies the conflict of interest factor, on a case by case basis, to lessen the deference normally given under this standard of review only to the extent necessary to counteract any influence unduly resulting from the conflict." Id.

> [W]hen a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interests of the fiduciary, we will not act as deferentially as would otherwise be appropriate. Rather, we will review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.

Id. (quoting Bedrick v. Travelers Ins. Co., 93 F.3d 149, 152 (4th Cir. 1996)) (internal quotation marks omitted).

12

We see no reason to alter this well-established framework of review because the plan at issue in this case is an unfunded, non-qualified plan. That fact alters the deference we give, but does not change our standard of review to de novo.

B.

Hence, we turn to the question of whether the Plan Administrator's decision to exclude the stock option gain as earnings was an abuse of its discretion.

As noted previously, the plan language is circular and ambiguous, providing no real guidance on the issue. The only other factors pertinent to our inquiry are whether the Plan Administrator considered adequate materials in making its decision, whether it engaged in a reasoned and principled decisionmaking process, and whether its ultimate decision was consistent with the Plan provisions and its earlier interpretations of the Plan. For the reasons set forth in the district court's opinion, we too conclude that these factors weigh against a finding that the Plan Administrator abused its discretion.

Upon receiving notification of Scipio's intention to draw early retirement benefits, and his proposed calculation including the stock option proceeds as earnings under the Plan, the Plan Administrator took pains to gather and consider information and material from a number of sources. The Plan Administrator hired Aon Consulting to calculate independently Scipio's benefit

13

calculation, which did so without including the $408,000 gain as earnings for the year 1993.  An opinion was obtained from outside counsel to the effect that the Plan language and applicable law would not lead to the conclusion that stock options were intended to be included as a part of the annual earnings used to compute an annual retirement benefit.  And, the Plan Administrator contacted the former CEO and Chairman of the Board of Directors for First Empire and Eagle involved at the time the Plan was drafted, as well as other employees, to gather evidence of the intent behind the Plan, and was advised that the Plan did not intend to include as earnings any gain realized from the exercise of options under the Stock Option Agreement.  Rather, the Plan Administrator was consistently advised that the intent of the Plan was to provide retirement benefits for key executives at roughly 70% of their typical annual salary for the remainder of their lives.  By including the $408,000 as part of his earnings for 1993, however, Scipio had advanced an amount quite atypical as his annual salary; he arrived at an average annual earnings more than $70,000 greater than the highest annual salary he ever earned as an executive with United.  The Plan Administrator also learned that retirement benefits for other similarly situated executives had been computed without inclusion of their stock option gains.

When Scipio continued to object to the Plan Administrator's decision to exclude the stock-option gain as a part of his

14

earnings, the Plan Administrator continued to evaluate the claim and look for guidance in interpreting its terms. The Plan Administrator looked to the Internal Revenue Code, and its provisions governing "qualified" benefit plans, for help. The definition of "compensation" applicable to "qualified retirement plans" under the Internal Revenue Code, see 26 U.S.C.A. § 415(c)(3) (West Supp. 2004), and the guidance found in Treasury Regulation § 1.415-2, see 26 C.F.R. § 1.415-2(d) (2004), also bolstered the conclusion that such plans would not normally consider stock option benefits in the calculation of annual retirement benefits. Under the Regulation, the term "compensation," for purposes of section 415(c)(3), normally includes items such as "[t]he employee's wages, salaries, [and] fees for professional services," 26 C.F.R. § 1.415-2(d)(2)(i), (2)(i)(2004), but excludes "[a]mounts realized from the exercise of a non-qualified stock option," 26 C.F.R. § 1.415-2(d)(3)(ii).[*]

---

[*] We note, and reject, Scipio's contention that the district court erred in equating the term "compensation" with "earnings" and in relying upon statutes and regulations governing "qualified" benefit plans to interpret a "non-qualified" benefit plan. First, the Plan Administrator did not rely solely upon those provisions in making its decision, but rather found support within them for its decision after Scipio continued his objection to the interpretation. We find no error in the district court's determination that, for purposes of the narrow issue before it, the terms "compensation" and "earnings" are synonymous, or in its determination that the distinction between the two plans is immaterial in evaluating whether it was reasonable for a Plan Administrator to exclude stock option gains from annual earnings when computing the retirement benefit due under a retirement plan.

After throughly considering the evidence and arguments, the district court concluded that, "[e]ven considering the Plan Administrator's conflict of interest," the "decision to exclude Scipio's gain from his 1993 stock option transaction as part of 'Earnings' was objectively reasonable and supported by substantial evidence." J.A. 183. We have carefully considered the arguments of Scipio and, for the reasons set forth in the district court's well-reasoned opinion, we reject them. Like the district court, we hold that the Plan Administrator's interpretation of the term "Earnings" to exclude the stock option gain was the product of a reasoned and principled decisionmaking process based upon adequate materials and inquiry, and that the decision was consistent with the purposes and goals of the Plan, the Plan provisions, and its earlier interpretations of the Plan.

## IV.

For the foregoing reasons, we affirm the district court's grant of summary judgment to United and denial of summary judgment to Scipio.

AFFIRMED